## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Docket No. _____

**MARK E. O'BRIEN,**

*Plaintif*

**v.**

**RUSHMORE LOAN MANAGEMENT SERVICES, LLC**
**CALIBER HOME LOANS, INC.**
**JOHN P. GRAYKEN**

*Defendants*

## COMPLAINT
### INTRODUCTION

As an exception to the Rooker-Feldman doctrine, this suit does not allege harm caused by a state court judgment, but instead challenges the fraudulent manner in which the state court judgment was procured. Fraud in the procurement of a judgment is an independent claim not barred by Rooker-Feldman. In the case at bar, fraud permeated the entire proceeding and precluded the workings of due process.

Four glaring examples of fraud stand out in this case. To begin with, the purported 25 July 2016 assignment of the subject mortgage from Bank of America, N.A. to *U.S. Bank Trust, NA as Trustee for LSF9 Master Participation Trust* is a factual impossibility because at the time, Bank of America had nothing to assign. The subject mortgage had been sold two years earlier to Lone Star Mortgage Holdings, LLC [Lone Star] at a Department of Housing and Urban Development [HUD] auction.

1

As this case worked its way through the state Court, great emphasis was placed on the fact that the Plaintiff had produced a lost note Affidavit. Only recently did an investigator hired by the Plaintiff discover that the Affidavit had been notarized by a woman only posing as a Notary, and that she hadn't used the Notary seal or listed the dates of her commission.

During the trial, Counsel for the foreclosing Plaintiff assured the Judge that several parties would never claim ownership of the subject mortgage because that simply doesn't happen.

However, on 5 January 2022, Bank of America, N.A. recorded an assignment to Bank of America, N.A. of the very mortgage—the subject of this suit—a mortgage it claimed to have assigned to LSF9 six years earlier.

Additionally, by its own admission, U.S. Bank had written, "The servicer is the party to the Trust that has the authority and responsibility to make decisions and take action regarding individual mortgage loans in the Trust. The trustee has no authority or responsibility… Please note, the Trust is the owner of the mortgage and note, not the trustee or us in our individual capacity. [Letter from Kevin Goldade. U.S. Bank Corporate Trust Services to Windham, MA homeowner. 10 July 2018]. [Exhibit – A]

Contrast this fact with the contention by at least two investigators that the LSF9 Master Participation Trust is a sham that owns no mortgages and that the entire foreclosure in this matter is a fraud—simply stated, the original Plaintiff in this foreclosure has no standing. *United Bank Trust, N.A. as Trustee for the LSF9 Master Participation Trus*t cannot be a Plaintiff because U.S. Bank Trust, N.A. is not the entity named in the relevant Securitization Servicing Agreement [SSA], and the *LSF9 Master Participation Trust* is listed in the SSA documents as merely an

agent. [U.S. Bank Trust, N.A. as Trustee for the LSF9 Master Participation Trust was the Plaintiff in the original foreclosure in this case].

## PARTIES

Mark E. O'Brien is a person residing in Winsted, Connecticut

Rushmore Loan Management Services, LLC is a corporation headquartered at 15480 Laguna Canyon Road, Irvine, CA 92618.

Caliber Home Loans, Inc. is a corporation headquartered at 1525 S Belt Line Road, Coppell, TX 75019.

John P. Grayken is a person residing in Ireland.

## JURISDICTION

Title 28, Section 1332 of the United States Code (28 U.S.C. § 1332 (a). For a federal court to have diversity jurisdiction over a lawsuit, two conditions must be met: the amount in controversy must exceed $75,000 and all plaintiffs must be of different citizenship than all defendants. Here, the amount-in-controversy exceeds $75,000, and all Plaintiffs are of different citizenship than all Defendants.

## VENUE

"A civil action may be brought in— a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." [28 U.S. Code § 1391]. The subject property is located in Winsted, Connecticut.

## FACTS

1. Upon information and belief, on December 16, 2004, Caroline S. O'Brien owed Fleet National Bank $50,000.00, as evidenced by a photocopy of a promissory note, payable to the order of Fleet National Bank.

2. By a deed of that date, Caroline S. O'Brien, to secure said note, purportedly mortgaged to Fleet National Bank the premises known as 114 Wetmore Avenue, Winsted (Winchester), Connecticut.

3. Fleet National Bank merged with and into Bank of America, N.A. Said mortgage was further assigned to U.S. Bank Trust, N.A., as Trustee for LSF9 Master Trust by an assignment dated July 25, 2016 and recorded August 11, 2016 in Volume 429 at page 706 of the Winsted (Winchester) Land Records. [Exhibit – B].

4. Caroline O'Brien died on August 3, 2009. The subject property devised to her heirs, Anna E; Joseph A; Kathleen M; Thomas J, and Mark E. O'Brien. By quitclaim deed, Anna E. and Joseph A. assigned their interests to the other three heirs.

5. In its Complaint to foreclose, the Plaintiff claimed, "on or before December 17, 2015, the Plaintiff became and at all times since then has been the party entitled to collect the debt evidenced by said note and is the party entitled to enforce said mortgage. The unpaid balance due pursuant to the terms of said note is $115,012.15, plus interest from March 28, 2011 and late charges and collection costs, that have not been paid although due and payable.

6. The case went to trial, and based upon the 25 July 2016 assignment of mortgage from Bank of America to *U.S. Bank Trust, N.A. as Trustee for LSF9 Master Participation Trust*, and the lost note affidavit produced by the Plaintiff, the Court ruled, "Based on the evidence which

was admitted the court finds that the plaintiff is the party entitled to collect the debt reflected by the lost note and is the party entitled to enforce the mortgage." [Order. Pickard, J. 5/20/2019].

7. Upon information and belief, Bank of America no longer owned the subject mortgage on 25 July 2016, and consequently could not assign it.

8. At trial, Plaintiff's witness, a Caliber employee took exception to Defendant O'Brien's criticism of the after-the-fact assignment, stating that that is how we [Caliber] do business.

9. Upon information and belief, the mortgage had been bundled together with other defaulted mortgages and sold by HUD at a Distressed Asset Stabilization Program auction on 11 June 2014.

10. Lone Star was the high bidder that day, purchasing loans valued at $3.8 billion for an average 77.6% of the property's value, and 65.8% of the unpaid loan balance, according to HUD calculations. With regard to the subject property, Lone Star purportedly paid an estimated $74,757. The subject property is presently valued at $220,800 by Zillow. [https://www.zillow.com/homedetails/114-Wetmore-Ave-Winsted-CT-06098/57835638_zpid/].

11. Upon information and belief, the subject mortgage was one of 176 distressed Connecticut loans purchased by Loan Star in June of 2014.

12. On July 25, 2016, HUD could have assigned the subject mortgage to U.S. Bank Trust, N.A. as Trustee for LSF9 Master Participation Trust. Bank of America [BOA] could not have. The assignment is a factual impossibility, and creates a break in the chain of title.

13. In its pleadings before the Connecticut Superior Court, the Plaintiff relied on a combination of the assignment and lost note affidavit. "Plaintiff is entitled to rely on the lost note affidavit. Defendant argues that Plaintiff cannot foreclose because the note has been lost.

5

The lost note affidavit in this case sufficiently confers the rights [sic] to foreclose upon the Plaintiff. Secondary evidence of the debt, as here [assignment], is sufficient to establish entitlement to enforce the promissory note." [Plaintiff Post-trial Brief. Pages 5-6. 10 April 2019].

14. After the trial had ended, the case worked its way through the Connecticut Appellate Court and Supreme Court and to the United States Supreme Court where certiorari was denied. Subsequently, Defendant Mark O'Brien commissioned a report by private investigator William Paatalo. [Exhibit - C].

15. During the trial, none of the Defendants could have afforded the report, nor did any of the Defendants know such a report was available.

16. Among other findings, investigator Paataalo discovered that the lost note affidavit had been notarized by a person who was not a Notary, didn't use the state Notary seal, and didn't list the dates of her alleged commission. [Paatalo Report. Page 18. Paragraphs 28-32]. [Exhibit – C].

17. This alleged Notary was-- and has been a BOA employee for the last 11 years in Tampa, Florida where her work is described as, "special projects position providing clerical support and data entry." [Linkedin].

18. The mortgage-in-question was a defaulted mortgage. "Within 30 days of the Secretary's written agreement to accept assignment of a defaulted mortgage, or within such additional time as the Secretary authorizes in writing, the mortgagee must file the assignment for record." [24 CFR § 203.3509(a)].

6

19. Upon information and belief, there is no land record of the assignment from Bank of America to HUD.

## UNCLEAN HANDS OF MORTGAGE SERVICERS

20. Caliber Home Loans, Inc. [Caliber] was the first servicer on the subject mortgage after it had been assigned to LSF9. The three Defendants in this case had submitted a complete loss mitigation application to Caliber in January-February 2021.

21. In January-February 2021, Caliber was owned by Lone Star.

22. Under the Real Estate Settlement Procedures Act [RESPA], if the borrower had sent the transferor servicer a complete loss mitigation application before servicing was transferred, the transferee servicer generally has to evaluate the borrower's application within 30 days of the transfer date, rather than the date the transferor servicer received the complete application."

23. Servicing for the subject mortgage was transferred to Fay Servicing, LLC sometime after February 2021. It did not evaluate the loss mitigation application submitted by the transferor servicer [Caliber], but began anew requesting documentation for a Fay loan modification.

24. Shortly after servicing was transferred to Fay, it was transferred to Rushmore Loan Management Services, LLC [Rushmore] on 15 June 2021.

25. Although a servicer is required to comply with 12 CFR § 1024.41, only for a single complete loss mitigation application; under § 1024.41(i), a transferee servicer is required

to comply with the requirements of § 1024.41 regardless of whether a borrower received an evaluation of a complete loss mitigation application from the transferor servicer.

26. After Rushmore had acquired servicing rights, Defendant Mark O'Brien contacted Rushmore to inquire about the loss mitigation application that had been submitted to Caliber. Rushmore's response was that it couldn't speak with Mr. O'Brien about the loan until O'Brien proved he was a successor-in-interest.

27. At Rushmore's request, documentation including deeds for the subject property and a photocopy of O'Brien's license to drive were sent to Rushmore. Rushmore asked that the documents be sent again because they weren't on file. Ultimately, Defendant O'Brien was approved as bona fide successor-in-interest. However, when *law day* had been set very near the critical 37-day period after which a loan modification application need not be reviewed unless complete, Defendant O'Brien was told by Rushmore that his approval as successor-in-interest had been a mistake and was no longer in effect.

28. Upon information and belief, a runaround of this sort is the rule rather than the exception. "She [Ive Santiago of Northwest Side Housing Center] said the company's [Caliber] representatives repeatedly lied, saying they hadn't received documentation, "when we knew darn [sic] well they did… We had proof of faxes."" [*The Chicago Reporter. "*Lincoln Yards Investor Lone Star Funds Accused of Predatory Lending." 4 April 2019].

## FRAUD UPON THE COURT

29.  At a Superior Court 1 August 2021 hearing concerning the setting of *law day,*
Defendant O'Brien protested the Rushmore runaround. Counsel for Rushmore told the Court that
Defendant O'Brien knew that if he was having difficulty with Rushmore he could telephone the
servicer's law firm, *Bendett & McHugh, PC.*

30.  After the hearing, Defendant O'Brien sent an email to Counsel for Rushmore. "Mr.
Knickerbocker, Per what you mentioned this morning, can you advise Rushmore that I'm a
successor-in-interest?-- that no longer is the Estate of Caroline O'Brien involved-- and that the
Administrator years ago closed-out the Estate. They've given me the runaround, and have many
requested documents already sent."

31.  Attorney Knickerbocker responded. "Nothing that happened this morning leads me
to believe that I must tell my client anything.  If my client is requesting that you supply
documents, I would imagine there is a reason for it.  I am certainly not going to go against what
my client says."

32.  Defendant O'Brien had been defending this action as successor-in-interest since
2018, a fact readily apparent in Court filings and known to Attorney Knickerbocker.

33.  Although Rushmore representatives refused to discuss the loan with Defendant
O'Brien, insisting he first prove his status as successor-in-interest, its counsel [Attorney
Knickerbocker] negotiated a settlement with O'Brien.

34.  "Jeff, The family's opening offer-to-settle is $75K. Does your client have a counter-
offer? Thanks, Mark." [Email from Defendant Mark O'Brien to Attorney Knickerbocker. 16
April 2023].

35.  Attorney Knickerbocker replied. "You Pay us, or we pay you?" O'Brien responded, "We pay you." [Email exchange. 16 April 2023].

36.  On 28 April 2023, Attorney Knickerbocker responded. "My client has declined your offer and not authorized me to counter." [Email from Attorney Knickerbocker to Defendant Mark O'Brien].

37.  During this time period, contacts at Rushmore were still refusing to discuss any aspect of the loan with Defendant O'Brien because he hadn't yet proved his status as successor-in-interest.

38.  There was a brief time period during which Defendant O'Brien had been approved by Rushmore as a valid successor-in-interest. That approval, however, was revoked by Rushmore as having been a mistake when a new *law day* issued from the Connecticut Superior Court.

39.  Upon information and belief, foreclosures are an integral part of the Lone Star business model. "The [New York] *Times* found evidence that supported this suggestion. Lone Star bundles large numbers of distressed mortgages and sells them off in bonds—and returns for bondholders come largely from the sale of foreclosed homes. The *Times* cites a confidential bond offering document in which Lone Star assured investors that foreclosure and resale of homes is expected for most of the mortgages." [*The Chicago Reporter*. 4 April 2019].

40.  "HUD's own data show that in most cases the speculative DASP [Distressed Asset Stabilization Program] buyers did not modify the loans, and did not turn them into performing loans. Instead, they foreclosed or arranged short sales." [Opportunity Denied. *National Consumer Law Center*. May 2016. Page 5. Paragraph 3].

41.  Lone Star Funds, the private-equity firm founded by billionaire John Grayken, had submitted winning bids for $3.9 billion of soured home loans sold in June 2014 by the Department of Housing and Urban Development.

## FRAUDULENT SERVICE

42.  On 8 March 2021, a writ for certiorari to the U.S. Supreme Court was denied, and on 21 October 2021, the original Plaintiff here, *U.S. Bank Trust, N.A. as Trustee for LSF9 Master Participation Trust*, assigned the mortgage to U.S. Bank National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust. [Truman Trust].

43.  The assignment-of-mortgage recites, "…transfers and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein…" [Exhibit – D].

44.  There is no note, only a fraudulently notarized lost-note-affidavit, and a purported photocopy of the note.

45.  There is no evidence in the record of value being paid except the vague assertion, "For good and valuable consideration, the sufficiency of which is hereby acknowledged…"

46.  The assignment is purportedly executed by Fay Servicing, LLC, as Attorney-in-fact for U.S. Bank Trust as Trustee for LSF9 Master Participation Trust. Ther is no authority for this power-of-Attorney anywhere in the Superior Court record.

47. In a move to substitute Truman Trust as new Plaintiff, *U.S. Bank Trust as Trustee for LSF9 Master Participation Trust LSF9* certified via Attorney Mark Piech of *Bendett & McHugh*, "I hereby certify that a copy of the above [Motion to Substitute Party] was mailed or electronically delivered on February 7, 2022 to all counsel and pro se parties and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served as follows: Mark E. O'Brien, 17D Fernwood Drive, Leominster, MA 01453."

48. Defendant Mark E. O'Brien had never consented to electronic service, nor was he electronically served. Additionally, regarding Defendant O'Brien, 17D Fernwood Drive was not the address listed on the Connecticut judicial website on 7 February 2022.

49. None of the three foreclosure Defendants were served a copy of the Motion to Substitute Party. [Affidavit of Kathleen M. O'Brien]. [Exhibit – E].

50. The motion was granted ex parte by the Superior Court on 23 February 2022. "It appearing to the court that the foregoing motion should be granted, it is hereby ordered that U.S. Bank, National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust be substituted as plaintiff in this action."

## **FRAUD BEFORE THE APPELLATE COURT**

51. The Plaintiff filed a motion to dismiss the Defendant's appeal, and in it wrote, "The Connecticut Supreme Court has also recognized that, once an issue has been abandoned on appeal, it may not be resurrected. In *Connecticut Sav. Bank v. Heghmann*, 193 Conn. 157, 474 A.2d 790 (1984), the trial court entered a judgment of foreclosure by sale. The mortgagor-defendants then filed an appeal. It was dismissed because, *like Defendants here*, the defendants

failed to file their appellate brief." [Plaintiff Motion to Dismiss Appeal. Pages 7-8. 30 March 2023]. [Emphasis supplied].

52. The Defendants in this case did not fail to file their appellate brief which in AC43004 was filed on 10 September 2019. The two successive appeals were dismissed as frivolous before a brief was due.

53. In its motion-to-dismiss the Defendant's most recent appeal, the Plaintiff writes, "On June 22, 2022, Defendant filed another appeal. *See* Doc. Entry No. 178.00. Plaintiff filed a motion to terminate the appellate stay and all future stays. The Court (*Moore J.)* granted that motion."

54. The Court did *not* grant the motion regarding *all future stays*, writing, "The motion to terminate stay is granted for reasons set forth on the record. The Court has ordered a transcript of its decision for signature which shall constitute the Court's memorandum of decision on this motion." [Order re Motion to Terminate Stay. Moore, J. 1 August 2022].

55. In its motion-to-dismiss Defendant's appeal, the Plaintiff referred the Appellate Court to the Superior Court transcript which *contradicts* the position of the Plaintiff. "So, in balancing the equities, the Court reaches the conclusion that to do administration justice does require the Court to grant the motion to terminate *the appellate stay* in this case." [Moore, J. Transcript Page 11: 15-18. Order 1 August 2022]. [Emphasis supplied].

## THE PAATALO REPORT

56. In October 2022, the Plaintiff received a report from Private Investigator William Paatalo who has worked exclusively since 2010 investigating foreclosure fraud, chain of title, the securitization of residential and commercial mortgage loans, accounting issues relevant to

alleged defaults, and has spent more than 15,000 hours consulting investigatory research specifically related to mortgage securitization and chain of title analysis.

Regarding the mortgage in this case, Mr. Paatalo drew these conclusions:

1. LSF9 MPT is not a trust that holds any assets.

2. LSF9 MPT is listed in securitization documents as, "Participating Agent."

3. LSF9 does not legally exist because it has no Trust agreement.

4. U.S. Bank *Trust*, N.A. is not the Trustee. [U.S. Bank, N.A. is listed Indenture Trustee in the relevant Securitization Servicing Agreement.]

5. LSF9 has no retainer or contractual connection to the Plaintiff named in the original foreclosure Complaint in this case. [U.S. Bank *Trust*, N.A.]

6. There is no authority for Caliber or any other servicer to be acting on behalf U.S. Bank *Trust*, NA as Trustee.

## SUBSEQUENT COMMUNICATIONS FROM INVESTIGATOR PAATALO TO FORECLOSURE DEFENDANT O'BRIEN

57. "The current entities behind all your garbage is Truman Capital Advisors and Roosevelt Management who are pulling all the strings. The debt is unsecured at best (if there ever was a debt) and these imposters bought data from insurance carriers (credit default swap providers, etc. [AIG]) who had no contractual rights or recourse against homeowners and the mortgages they seek to foreclose. THERE IS NO ACCOUNT RECEIVABLE ANYWHERE TO PROVE CREDITOR STATUS! It's that simple." [Email from Investigator Paatalo to Mark E. O'Brien. 2 August 2023].

58.  "I now have the proof to show LSF9 fraud. Both trials have bore fruit and we now have critical admissions and evidence that LSF9 doesn't purchase or hold any assets. They admit there are "other trusts involved" and that LSF9 Mortgage Holdings is the party to initially purchase, and they then sell to a whole bunch of different VOLT LLC entities and series trusts. LSF9 MPT is a pseudonym used to conceal other parties." [Email from Investigator Paatalo to Plaintiff O'Brien. 1 October 2023].

## PAATALO CONFIRMED BY THE RECORD

59.  A document was introduced recently in a Massachusetts case indicating that a mortgage debt was *not* being collected by Fay Servicing on behalf of *U.S. Bank Trust, NA as Trustee for LSF9 Master Participation Trust,* the original foreclosure Plaintiff is this case. "We are collecting a debt on behalf of VOLT 2019 NPL5." *[U.S. Bank Trust, N.A. as Trustee for LSF9 Master Participation Trust v. Stephen Walsh et al. 22H83SP04075Pl.* Exhibit 12].

60.  *VOLT NPL IX Asset Holdings Trust* is Plaintiff in foreclosure cases across the country.

## OTHER INVESTIGATORS WEIGH-IN

61.  "There is no person or company that maintains any entry on any accounting ledger of any legal entity on which the obligation is established as a loan account receivable. Such an entry could only be made if value was paid. No value is paid for ownership of the underlying obligation under the current securities scheme; hence nobody can claim legal ownership of the obligation or any right to enforce it. *Continued*…

62.  "I would also add that LSF9 trust is no trust. It is a fictitious entity. You might analogize it to a hologram of a hologram of an empty paper bag. There are no trustee duties and

hence no trustee, regardless of labels used to confound the courts, lawyers, and clients. There is no *res* or thing (or "loan") owned by USB or any trust — least of all the sham monstrosity called LSF9 Master Participation Trust. [Attorney Neil Garfield. 5 January 2020. https://livinglies.me/].

63.   Upon information and belief, the LSF9 Master Participation Trust owns no mortgages although U.S. Bank stated, "The Trust is the owner of the mortgage and note." [U.S. Bank letter to Massachusetts homeowner. 10 July 2018]. [Exhibit – A].

64.   Upon information and belief, U.S. Bank was referring to the many VOLT securitized-mortgage Trusts.

65.   Where securitized mortgages are involved, foreclosing Plaintiffs have insisted that Defendants have no standing to challenge any aspect of the securitization process. However, attached to the U.S. Bank letter to the Massachusetts homeowner is a *U.S. Bank* document titled, "Role of the Corporate Trustee." On the first page is a paragraph, "Distinct Party Roles," which reads, "Parties involved in an MBS [Mortgage-backed security] transaction include the *borrower*, the originator, the servicer and the trustee, each with their own distinct roles, responsibilities, and limitations." [Exhibit – F]. [Emphasis supplied].

66.   "The Depositor, LSF or Lone Star Funding purchases defaulted loans on a contingency deal and they are only held in the trust on a provisional basis. Nobody pays for them until after foreclosure and sale of the property. If this was not true, when Freddie and Fannie auction off billions of dollars in defaulted notes, there would be billions of dollars flowing into the U.S. Treasury, but no such thing happens. This is the primary reason they never let anyone see the PSA. [Pooling and Servicing Agreement]. The best they do is providing the two pages on Caliber as the Servicer and the other some 50 pages are all blacked out." [Park Place Securities,

Inc. *Foreclosures by Caliber Home Loans Often a Scam. Learn How to Fight Them.*
https://parkplacesecurities.com/caliber.html].

67. Upon information and belief, the subject mortgage in this case was pledged to at least
one MBS Trust, which was not LSF9.

68. Presently, there are two entities claiming ownership of the subject mortgage—U.S.
Bank National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust, by 21
October 2021assignment from the LSF9 Master Participation Trust; and Bank of America, N.A.
by 5 January 2022 assignment from Bank of America, N.A. [Exhibit – G].

69. The mortgage at issue could not have been legitimately pledged to the LSF9 Master
Participation Trust because that Trust has no assets, and is identified in Securitization Servicing
Agreements as merely, "Participation Agent."

70. Upon information and belief, the mortgage was pledged to one of the VOLT asset-
back series Trusts. In the securitization servicing agreement that is Exhibit 15 in *Walsh,* and an
Exhibit in the Paatalo Report, VOLT LX LLC is identified as the issuer.

71. The SSA is dated 16 June, 2017 and identifies other documents that have rarely or
never been made public—the *Trust Agreement* dated 10 July 2014, by and among the owner
Trustee; Wells Fargo Bank, N.A., as certificate registrar and Trust paying agent, and the sponsor,
as may be amended from time to time.

72. Additionally, the *Master Participation Agreement* dated 17 July 2014 among the
Participating Agent, the Sponsor and Wells Fargo Bank, N.A.

73. Lastly, the *Custodial Agreement* dated 16 June 2017, among the custodian, the
depositor, the Indenture Trustee, the Issuer, the Participation Agent, and the servicer.

74. Upon information and belief, these documents would reveal who legitimately holds the subject mortgage and the true date on which it was acquired.

75. Investigator Paatalo testified to that effect in a Florida foreclosure case. "And in all the cases I've worked we have been trying to get this particular Plaintiff to produce that document [Trust Agreement, or Pooling and Servicing Agreement PSA] with no success. Because that document is going to name all the parties to the agreement and all the authorities and when the transaction closed and it's going to give me a lot of information that assist in my understanding of the chain of title." [US BANK AND TRUST, NA, AS TRUSTEE FOR LSF9 MASTER PARTICIPATION TRUST v. JAMES K. MURPHY AND PATRICIA PEARSON. [Florida] 15th Judicial Circuit Court. Case #50-2017-CA-012236XXXXMB. Transcript. 9 October 2019. Pages 104: 24-25; 105: 1-5].

76. The city of Los Angeles sued U.S. Bank, N.A.—not U.S. Bank *Trust*, N.A., alleging that in its role as trustee for pools of mortgage loans that were turned into securities and sold to investors—it left foreclosed and blighted properties empty and abandoned.

77. In fact, the SSA in the Paatalo Report defines the Trust Estate: "The assets pledged by the issuer [VOLT LX, LLC] to the Indenture Trustee [U.S. Bank, N.A.] to secure the notes."

78. In the Los Angeles settlement, a pooling and servicing agreement [PSA] dated 10 July 2014 between the very parties in this case is noted. That PSA is not part of the record in this case.

79. That date comports with the date on a Lone Star web page. "Lone Star Fund IX held their final closings in July 2014 with $7.2 billion in combined capital commitments." [http://www.lonestarfunds.com/].

80. The July 2014 closing date precludes the subject mortgage being assigned into a mortgage-backed securities Trust where typically there is a cutoff date 90 days after closing, beyond which the Trust is closed to new mortgages.

81. The subject mortgage was assigned to U.S. Bank *Trust*, N.A as Trustee for LSF9 in July 2016.

82. Additionally, mortgage-backed Trusts cannot accept non-performing loans. The subject loan was in default at the time of assignment.

83. The PSA is absent in this case as is the original note.

84. Investigator Paatalo noted in his report for the foreclosure Defendants in this case that the SSA which is an exhibit in his report references undisclosed ancillary agreements and missing parties in the chain of title for the subject mortgage:

**Trust Agreement:** The trust agreement, dated July 10, 2014 by and among the Owner Trustee, as owner trustee, Wells Fargo Bank, N.A., as certificate registrar and trust paying agent, and the Sponsor, as may be amended from time to time.

**Participation Agreement:** The master participation agreement, dated July 17, 2014, among the Participation Agent, the Sponsor and Wells Fargo Bank, N.A., as participation registrar, as supplemented by the participation supplements thereto and as may be amended or supplemented from time to time.

**Custodial Agreement:** The custodial agreement, dated June 16, 2017, among the Custodian, the Depositor, the Indenture Trustee, the Issuer, the Participation Agent and the Servicer, relating to the VOLT LX Asset Backed Notes, Series 2017-NPL7, as may be amended from time to time.

**Custodian**: Wells Fargo Bank, N.A., or its successor in interest or assigns.

**Sponsor**: LSF9 Mortgage Holdings, LLC or any successor thereto.

**Depositor**: VOLT IX Master Depositor, LLC or any successor thereto.

85. Upon information and belief, the assignment from Bank of America to LSF9 is not a business record but a document manufactured specifically for foreclosure purposes—two years after the actual assignment-- and as such is inadmissible hearsay.

86. The original Plaintiff in this case has no standing because the LSF9 Master Participation Trust is merely an *agent* that holds no assets.

87. U.S. Bank Trust, NA as Trustee for LSF9 Master Participation Trust is an entity created strictly for foreclosure purposes—an imaginary construct registered as a statutory Trust in Delaware to lend legitimacy to the entire affair.

88. Truman 2016 SC6 Title Trust is also a statutory Trust registered in Delaware, and upon information and belief is just a foreclosure conduit that funnels foreclosure proceeds to one of the many VOLT securitized mortgage Trusts.

89. U.S. Bank *Trust*, N.A. by its own admission doesn't own the Trust assets, and according to investigators has been given no authority by the true party in interest. Consequently U.S. Bank *Trust*, N.A. has no standing to foreclose, nor does the imaginary construct U.S. Bank *Trust*, N.A. as Trustee for LSF9 Master Participation Trust.

90. U.S. Bank *Trust*, N.A., and U.S. Bank, N.A. are separate subsidiaries of U.S. Bank.

91.  The Defendants including the Plaintiff in this action suffered emotional distress not

knowing when their home would be taken away to the exclusion of due process.

## CAUSES OF ACTION

### UCC § 9

**Transfer of Ownership**

Unlike Article 3, Article 9 applies to interests in both negotiable and non-negotiable instruments.
UCC § 9-102(a)(47). Article 9 applies to both a security interest in a mortgage note to secure an
obligation and to the rights of a buyer of a mortgage note. UCC § 9-109(a)(1) and (3). Article 9
thus determines the requirements for an "effective" transfer of rights in those two situations.

UCC § 9-203.

 "Attachment and enforceability of security interest**;** proceeds; supporting obligations; formal
requisites. **(a)** A security interest attaches to collateral when it becomes enforceable against the
debtor with respect to the collateral, unless an agreement expressly postpones the time of
attachment.

   **(b)** Except as otherwise provided in subsections **(c)** through **(i)**, a security interest **is**
enforceable against the debtor and third parties with respect to the collateral only if:

   (1) Value has been given;"

        There is no evidence that value was given regarding the three assignments in this case.

The is only a vague recitation in the first assignment from Bank of America, N.A. to U.S. Bank

Trust, NA as Trustee for the LSF9 Master Participation Trust: "FOR VALUE RECEIVED…"

        And in the later assignment from U.S. Bank Trust, NA as Trustee for the LSF9 Master

Participation Trust to U.S. Bank National Association as Legal Title Trustee for Truman 2016

SC6 Title Trust: "FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which

is hereby acknowledged…"

Similarly, in the assignment from Bank of America, N.A. to Bank of America, N.A., is a recitation identical to that of U.S. Bank Trust, NA. to LSF9. Both assignments were prepared by the Collateral Department of *Meridian Asset Services, LLC* which specializes in manufacturing foreclosure documents.

The requirements for an effective transfer of ownership (in the case of a sale) or a security interest to secure an obligation (in the case of a loan secured by the mortgage note) are straightforward:

**1.** Value must be given--this is typically satisfied by the payment of the purchase price in the case of a sale of a mortgage note and the promise to make a loan or the advance of the loan amount in the case of a security interest to secure an obligation. UCC § 1-204.

## GOOD FAITH AND FAIR DEALING

"This principle provides: ''Every contract imposed upon each party a duty of good faith and fair dealing in its performance and its enforcement.'' 2 Restatement (Second) Contracts, § 205 p. 99 (1981). Our Supreme Court has applied this doctrine in a variety of contractual relationships and has observed that ''[t]he Restatement (Second) of Contracts similarly recognizes an implied covenant of good faith and fair dealing in every contract without limitation.'' *Magnan v. Anaconda Industries, Inc*., 193 Conn. 558, 566, 479 A.2d 781 (1984). The commentary to § 205

The duty of good faith and fair dealing was breached by Rushmore when it refused to acknowledge Defendant O'Brien as a legitimate successor-in-interest to the subject property

22

when its lawyer *knew* O'Brien was a successor-in-interest and had negotiated a settlement with O'Brien.

Rushmore offered loan modification as one of the options available to the Defendants here but then withheld that option on false pretenses—that none of the Defendants had proved their status as successors-in-interest.

The duty of good faith and fair dealing was breached by Rushmore when it declined to evaluate the complete loss mitigation application supplied to Caliber by the Defendants, and when it refused to acknowledge the Defendants as successors-in-interest when that fact had long been established in the Court record.

## FRAUD

**In Connecticut, fraud is committed when:**

- a person makes a false representation as a statement of true fact
- the person knows the statement is not true
- the person makes the statement to induce another person to act upon the statement
- the person who acts upon the statement sustains damages

### Fraudulent Assignment of Mortgage

Caliber authored the 2016 assignment from Bank of America to LSF9 knowing that LSF9 holds no mortgage assets, and knowing that U.S. Bank *Trust*, N.A. is not the indenture Trustee. Caliber knew this because as servicer, it was a party to the relevant securitization servicing agreements, and knew that the mortgage had been securitized into a VOLT Trust.

The Defendants in the original foreclosure action were induced to defend or lose their home based on an assignment to a trustee with no authority and a Trust that holds no mortgages.

The Defendants were damaged by these false representations because the Connecticut Superior Court awarded strict foreclosure to the Plaintiff, based in part on this assignment.

### **Fraudulent Assignment Where Assignor Had Nothing to Assign**

The subject mortgage had been sold at a HUD DASP auction several years before Bank of America purportedly assigned it to LSF9. Additionally, Bank of America assigned the subject mortgage to itself six years after it had assigned it to LSF9. Bank of American cannot credibly assert that it didn't know of its earlier assignment to LSF9.

Defendants Caliber and Rushmore knew about the HUD auction because as U.S. Bank explained in its letter to a homeowner facing foreclosure, "… the servicer is the only party with the authority and responsibility to make decisions regarding this mortgage and they are not affiliated with U.S. Bank in any way." Further, the servicer is privy to all the documents in the chain of custody for the mortgage—a chain of custody Investigator Paatalo has long been chasing.

The Defendants were damaged by the factually impossible assignment to LSF9 because it was used to obtain a judgment of strict foreclosure, against which the Defendants were induced to defend.

Additionally, the fraudulent assignment by Bank of America to itself injured the Defendants because no longer is there clear title to the subject property where two entities are claiming ownership of the mortgage.

24

**Fraudulent Notarization of the Lost Note Affidavit**

Bank of America employee Rebecca Kowal knew she wasn't a Notary when on 2 September 2015, she witnessed the signature of Bank of America assistant vice president Yamilla Soto concerning the allegedly-lost mortgage note.

Because of the lost note Affidavit, bolstered by the fraudulent assignment of mortgage, the Defendants in the original foreclosure action were induced to defend against the foreclosure.

The fraudulent notarization was used by the Plaintiff to obtain the foreclosure judgment, damaging the Defendants.

**Fraud Upon the Superior Court—False Certification of Service**

*Bendett & McHugh* law firm, acting on behalf of servicer client Rushmore falsely certified that it had notified Defendant O'Brien of its motion to substitute party Plaintiff U.S. Bank N.A. as Legal Title Trustee for Truman 2016 SC6 Title Trust.

*Bendett & McHugh* cannot credibly say it didn't realize that none of the Defendants had been served with the motion. In the absence of notification, the Defendants were induced to not respond to the motion.

The Defendants were damaged by this falsity because the Superior Court granted the motion ex parte, and it was used to obtain judgment of strict foreclosure on behalf of the substituted Plaintiff.

**Fraud Upon the Appellate Court**

*Bendett and McHugh*, having access to the pleadings and Court orders, knew that the Defendants hadn't failed to file their Appellate brief, and knew that the Superior Court hadn't terminated all future Appellate stays.

The Defendants were damaged by these false statements of fact because they were induced to defend against them, and the statements became part and parcel of the Appellate Court's decision to dismiss the appeal as frivolous.

### Negligent Infliction of Emotional Distress

The Defendant servicers owed the mortgagors here, including Defendant Mark O'Brien a duty of care because they offered loan modifications in mailings to the Defendants but asked for documentation they had already received or that was clearly part of the Court record, including the death certificate for Caroline O'Brien who had died thirteen years earlier. Further, Caliber didn't evaluate a complete loss mitigation application sent by the Defendants but transferred the servicing to Fay which transferred to Rushmore. Contrary to federal statutes, Both Fay and Rushmore insisted they were required to begin anew by ascertaining the identities of the successors-in-interest. Rushmore asked to speak to the Executor of an estate it knew had closed years earlier. Rushmore's own lawyer had appeared in Court with Defendant Mark O'Brien. He had negotiated a possible settlement with O'Brien. Still Rushmore refused to acknowledge O'Brien as a successor-in-interest and wouldn't even discuss the loan by telephone.

*Law day* had been set by the Plaintiff and substitute-Plaintiff at least three times, and but for the appeal process, the home would have vested in the Plaintiff.

The Defendants here suffered emotional distress that their home would be stolen away. Mortgage modification, it seemed to the Defendants had been a cruel hoax. Two of the Defendants presently live at the subject property. The third Defendant, an American with a disability plans to retire there.

*"So how did Lone Star Funds become so successful? In our opinion, through dubious business practices. Making money the honest way is noble. Cheating borrowers and property*

26

*owners is not… Residential borrowers who have seen their loans purchased by a Lone Star fund are in for a truly difficult struggle."* [https://www.lenderliabilitylawyer.com/blog/121/lone-star-funds-distressed-investors-or-vultures/].

### Respondeat Superior

Under the theory of Respondeat Superior, John P. Grayken is named as a Defendant. Grayken is an American-born Irish billionaire financier, the founder and chairman of the private equity firm Lone Star Funds.

**WHEREFORE,** in light of fraud employed by the Defendants to foreclose on the subject property, the Plaintiff seeks the fair value of the home, $220,800; damages in an amount the Court sees fit to compensate the foreclosure Defendants for the negligent infliction of emotional distress, and an injunction preventing the foreclosure Plaintiff from seeking a new *law day*, from acting upon any perceived *law day*, from seeking to evict the Defendants, or from otherwise interfering with the foreclosure Defendants' quiet enjoyment of the subject property.

Respectfully Submitted,

_____
Mark E. O'Brien
114 Wetmore Avenue
Winsted, Connecticut 06098
860.903.4773.
justice457@gmail.com