## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARK E. O'BRIEN, | No. 3:23-cv-01369 |
| *Plaintiff*, | |
| vs. | |
| RUSHMORE LOAN MANAGEMENT SERVICES, LLC, CALIBER HOME LOANS, INC., FAY SERVICING, LLC, JOHN P. GRAYKEN, LONE STAR GLOBAL ACQUISITIONS, LTD (d/b/a/ LONE STAR FUNDS), and U.S. BANCORP (d/b/a U.S. BANK TRUST, NA, and U.S. BANK NA), | |
| *Defendants*. | |

### RULING ON MOTIONS TO DISMISS

Plaintiff Mark E. O'Brien brings this action against Defendants Rushmore Loan Management Services, LLC ("Rushmore"), Caliber Home Loans, Inc. ("Caliber"), Fay Servicing, LLC ("Fay Servicing"), John P. Grayken, Lone Star Global Acquisitions, Ltd. (d/b/a Lone Star Funds) ("Lone Star"), and U.S. Bancorp (d/b/a U.S. Bank Trust, NA and U.S. Bank, NA) ("U.S. Bancorp").[1] Plaintiff, who is representing himself, seeks damages, injunctive relief,

---

[1] Plaintiff asserts that "U.S. Bank Trust, N.A., and U.S. Bank, N.A. are separate subsidiaries of U.S. Bancorp." ECF No. 67 at 41. I will thus address U.S. Bank Trust, N.A. ("U.S. Bank Trust") and U.S. Bank, N.A. ("U.S. Bank") separately throughout this ruling.

and "reasonable legal fees" for the prosecution of this suit.[2]  Defendant Grayken now moves to

dismiss the claims against him under Rule 12(b)(5) of the Federal Rules of Civil Procedure, and

Defendants Rushmore, Caliber, and Fay Servicing (collectively, the "Servicer Defendants")

move to dismiss under Rule 12(b)(6).  For the reasons explained below, Defendants' motions to

dismiss are granted.

## I.    BACKGROUND

### A.  Factual Background

The following facts are drawn from Plaintiff's second amended complaint ("the

complaint") and the attached exhibits.[3]  ECF No. 67.  These facts are accepted as true for the

purpose of this motion.  I note, however, that Plaintiff's complaint is very long and very difficult

to follow.  His allegations are disorganized and at times appear contradictory; he refers to parties,

including himself, in inconsistent and unclear ways; many of his allegations pertain to entities

who are not parties to this case or appear otherwise to be unrelated to this case; and Plaintiff's

---

[2] Although the second amended complaint states that Plaintiff is "licensed in several federal jurisdictions," he provides no bar number of any court in his signature block and does not indicate whether the license he holds is a license to practice law.  *See* ECF No. 67 at 66.  Further, Defendants have treated Plaintiff as a *pro se* litigant and given him notice of the requirements for pressing a motion to dismiss.  *See, e.g.*, ECF No. 33-3.  Under these circumstances, I will treat Plaintiff as a *pro se* and afford him the procedural leeway that courts must provide to such litigants in the Second Circuit.

[3] "In considering a motion to dismiss…a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."  *Newman Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996).

claims are not numbered or clearly delineated.  I have done my best to make sense of Plaintiff's claims and to construe his allegations favorably to him.

1.      **The Parties, Mortgage, and State Court Proceedings**

Mark E. O'Brien is a resident of Connecticut.  *Id.* at 3.  His mother, Caroline S. O'Brien, secured a $50,000 home equity line of credit ("the mortgage") with Fleet Bank for property at 114 Wetmore Avenue, Winsted, Connecticut ("the property").  *Id.* at 5.  Mrs. O'Brien died in 2009, and Plaintiff is a "successor-in-interest" to the property.  *Id.*

In July 2016, after Fleet Bank merged with Bank of America, the mortgage was assigned to U.S. Bank Trust "as Trustee for [the] LSF9 Master Participation Trust" ("the LSF9 Trust").  *Id.* at 5-6.  The LSF9 Trust is maintained by Lone Star.  *Id.*  Lone Star is a private equity fund that focuses on real estate investments and which was founded and is owned by John P. Grayken.  *Id.* at 7.  Caliber acted as "attorney-in-fact" for Bank for America for this assignment and became the servicer of the mortgage on April 26, 2016.  *Id.* at 7, 18.  During this time, Caliber was owned by Lone Star.  *Id.* at 7, 11, 21.

On October 24, 2016, U.S. Bank Trust brought a foreclosure action against Mrs. O'Brien's successors-in-interest in Connecticut Superior Court.  *Id.* at 8.  The case was subsequently appealed to the Connecticut Appellate Court and Connecticut Supreme Court.  *Id.*

3

at 19, 28.[4]  It was then appealed to the United States Supreme Court, which denied certiorari on March 8, 2021.  *Id.*

On January 24, 2021, while Plaintiff's appeal before the United States Supreme Court was pending, Plaintiff and the other foreclosure defendants submitted a "complete loss mitigation application" to Caliber.  *Id.* at 21.  The application was sent again by email on January 29, 2021, after an agent for Caliber informed Plaintiff that the application was not "in the system."  *Id.*  By this time, Caliber had formally recognized Plaintiff as a successor-in-interest.  *Id.* at 23, 25.

On February 25, 2021, Caliber sent Plaintiff a "good-bye" letter thanking Plaintiff for being one its customers, and on March 19, 2021, the mortgage was transferred to Fay Servicing.  *Id.* at 21.  According to a Caliber spokesman, Plaintiff's loss mitigation application had not been acted upon before the mortgage was transferred.  *Id.*  Fay Servicing did not review the loss

---

[4] The complaint does not provide the names or docket numbers for the state court foreclosure proceedings or Plaintiffs' subsequent appeals, but Defendants have attached documents from the state court litigation to their briefs.  I can take judicial notice of these filings and orders when deciding the present motions.  *See Musciotto v. Nardelli*, No. 3:19-CV-559 (KAD), 2019 WL 5086691, at *2 (D. Conn. Oct. 10, 2019) ("In deciding a motion to dismiss, the Court may take judicial notice of public records such as pleadings, orders, judgments, and other documents from prior litigation, including state court cases.").  These documents show that the Connecticut Superior Court for the Judicial District of Litchfield at Torrington entered a judgment of strict foreclosure on May 20, 2019, ECF No. 74-9; the Connecticut Appellate Court entered an order affirming the trial court's judgment on March 10, 2020, ECF No. 74-11; Plaintiff sought reconsideration, which was denied by the Appellate Court on April 15, 2020, ECF No. 74-12; and the Connecticut Supreme Court denied Plaintiff's petition for certification on June 10, 2020, ECF No. 84-9.

mitigation application submitted by Caliber and instead requested new documentation from Plaintiff. *Id.* at 21-23.

On June 15, 2021, the mortgage was transferred again—this time, from Fay Servicing to Rushmore. *Id.* at 22. Fay Servicing told Plaintiff that the only thing that would change about his mortgage loan was who would be collecting his mortgage loan payments. *Id.* After servicing rights were transferred, Plaintiff contacted Rushmore to inquire about the complete loss mitigation application that he had previously submitted to Caliber. *Id.* at 23. Rushmore said that it could not discuss the loan with Plaintiff until he proved his status as successor-in-interest. *Id.* Plaintiff sent documentation, including deeds for the property and a copy of his driver's license, to Rushmore. *Id.* He was eventually approved by Rushmore as a bona fide successor-in-interest, but was then told that this had been a mistake. *Id.* Rushmore revoked his status as a successor-in-interest and then asked him to resend various documents, including Mrs. O'Brien's death certificate, deeds, and copies of drivers' licenses. *Id.* These actions were meant to frustrate Plaintiff's efforts to obtain a loan modification. *Id.* at 24.

Plaintiff protested Rushmore's "runaround" at a Connecticut Superior Court hearing. *Id.* Rushmore's counsel said that Plaintiff should call "Bendett & McHugh, PC," "the servicer's law firm," to address any difficulties he was having. *Id.* After the hearing, Plaintiff asked Rushmore's counsel to advise his client that Plaintiff was a successor-in-interest to the property.

*Id.* Rushmore's counsel declined to do so, and Rushmore representatives continued to refuse to discuss the loan with Plaintiff. *Id.* at 25.[5]

On October 21, 2021, U.S. Bank Trust assigned the mortgage to U.S. Bank "as Legal Title Trustee for [the] Truman 2016 SC6 Title Trust" (the "Truman Trust"). *Id.* at 26. An attorney from the Bendett & McHugh law firm then moved to substitute U.S. Bank into the foreclosure proceedings. *Id.* Though Plaintiff and the other foreclosure defendants were not served a copy of this motion, the Connecticut Superior Court granted it. *Id.* at 27-28.

An Order of Ejectment has since been issued in the state court foreclosure proceedings. *Id.* at 9, 29. At the time of Plaintiff's complaint, that order was stayed and "under appeal." *Id.* Plaintiff contends that the Order of Ejectment was based on a "misreading" of a previous state court order. *Id.* at 29.

### 2.    The Alleged Foreclosure Fraud

After the United States Supreme Court denied certiorari, Plaintiff commissioned a report from William Paatalo, a private investigator who investigates foreclosure fraud and related issues. *Id.* at 9, 19. Plaintiff did not know that he could commission such a report at the time of

---

[5] I pause here to note that if what Plaintiff describes, as recounted in the last few paragraphs, is true, then I can readily understand his frustration with the Defendants, their lawyers, and the mortgage servicing business in general. But however reasonable his frustration may be, the law requires me to dismiss his claims unless they satisfy the requirements that I describe below.

the foreclosure action, and neither he nor the other foreclosure defendants could have afforded to do so at that time.  *Id.*

This report ("the Paatalo report") and other sources show that the LSF9 Trust was a "make-believe Trust" that did not hold any assets and "d[id] not legally exist."  *Id.* at 8-9; *see also id.* at 9-20, 33-34, 37-40.  The LSF9 Trust was closed in July 2014—two years before the mortgage was transferred to U.S. Bank Trust—and there were missing parties in the mortgage chain of title.  *Id.* at 5-6, 12-13, 39.  The July 2016 mortgage assignment was thus "fraudulent," and an entity other than U.S. Bank Trust owned the mortgage at the time of the foreclosure proceedings.  *Id.* at 8, 14, 20, 22, 36-41.  U.S. Bank Trust knew that it did not own the mortgage and thus did not have standing to bring the foreclosure action against Plaintiff, but it did so anyways.  *Id.* at 8, 14, 40-41.  Further, the "lost note affidavit" on which U.S. Bank Trust relied in the foreclosure proceedings was not properly notarized.  *Id.* at 19-20.

The October 2021 assignment-of-mortgage to U.S. Bank, as trustee of the Truman Trust, was likewise invalid.  *Id.* at 27-30, 40.  Though the Truman Trust has represented to Plaintiff and other homeowners, by mail and electronically, that it owns their mortgages, it does not.  *Id.* at 32-33.  Nor does it have standing to foreclose on the property at issue in this case.  *Id.*

Plaintiff and the other foreclosure defendants suffered emotional distress as a result of their frustrated efforts to obtain a loan modification from the defendant loan servicers and from "not knowing when their home would be taking away to the exclusion of due process."  *Id.*  at 41.

B.  **Procedural Background**

This action was filed on October 18, 2023.  ECF No. 1.  The original complaint named Rushmore, Caliber, and Grayken as defendants.  *Id.* at 1.

Plaintiff filed an amended complaint, which added Fay Servicing as a defendant.  ECF No. 13.  Caliber waived service, ECF No. 23, and Plaintiff served Rushmore and Fay Servicing, ECF No. 24; ECF No. 25.

Rushmore filed a motion to dismiss on March 26, 2023.  ECF No. 33.[6]  I gave Plaintiff an opportunity to file an amended complaint in which he addressed the alleged defects in that motion.  ECF No. 34.  He was directed to do so by April 16, 2024, but this deadline was later extended to May 21, 2024.  *Id.*; ECF No. 51; ECF No. 39.  In the intervening time, Caliber and Fay Servicing filed their own motions to dismiss.  ECF No. 39; ECF No. 53.

On April 7, 2024, Plaintiff filed a "Notice Regarding Service on Defendant Grayken," in which he explained that Grayken would be served the following day at "Millenium Tower, Boston where he sometimes resides" and "maintains a suite," and "at Pryf[or]d Court in Surrey, a residence owned by Mr. Grayken."  ECF No. 37 at 1-2.  Plaintiff filed two proofs of service on April 9, 2024.  ECF No. 45; ECF No. 46.  The first noted that a server "left the summons at [Grayken's] residence or usual place of abode with Chase (doorman), a person of suitable age

---

[6] Defendants have filed the Notice to Pro Se Litigants required by the Court's Local Rules.  *See, e.g.*, ECF No. 33-3.

and discretion who resides there, on 4/8/2024, and mailed a copy to the individual's last known address." ECF No. 45 at 1. And the second indicated that a server in the United Kingdom left legal documents, "as provided" by Plaintiff, with an individual named "PETKO" on Monday, April 8, 2024, at "Pyrford Court, Pyrford Common Road, Woking, GU22 8UB." ECF No. 46 at 1. According to this submission, Petko described himself to the server "as a handyman, gardener and general assistant to the Grayken family who he [had] been employed by for many years." *Id.* He told the server "that Mr. Grayken was not present at this time but should return on Saturday." *Id.* The server asked Petko "if he was authorized to accept these documents on behalf of Mr. Grayken and would he bring them to his urgent attention on his return." *Id.* After Petko "agreed to do so," the server "handed him the documents in a sealed envelope address to Mr. John P. Grayken, Pyrford Court, Pyrford Common Road, Woking, GU22 8UB." *Id.* at 2.

Plaintiff moved for default entry as to Grayken on April 30, 2024. ECF No. 58. Grayken subsequently appeared in the case, and I granted him an extension of time in which to file a responsive pleading. ECF No. 60; ECF No. 64.

Plaintiff filed a second amended complaint—which is the operative complaint for the purposes of this ruling, and which added Lone Star and U.S. Bancorp as defendants—on May 21, 2024. ECF No. 67. I denied the pending motions to dismiss as moot in light of this filing, but instructed Defendants that they could incorporate by reference their prior briefing. ECF No. 68. I also denied Plaintiff's motion for default entry against Grayken. ECF No. 70.

Defendants filed the present motions to dismiss over the course of June and July 2024. ECF No. 72; ECF No. 78; ECF No. 83; ECF No. 88.  They are now ripe for adjudication.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(5)

"A Rule 12(b)(5) motion is the proper vehicle for challenging the mode of delivery or lack of delivery of the summons and complaint." *Boahen v. Trifiletti*, No. 3:18-CV-00171, 2019 WL 688412, at *3 (D. Conn. Feb. 19, 2019) (internal quotation marks omitted).  "Valid service is required before a federal court may exercise personal jurisdiction over a defendant." *Darowski v. Wojewoda*, No. 3:15-CV-00803, 2016 WL 4179840, at *2 (D. Conn., Aug. 7, 2016).  "In deciding a Rule 12(b)(5) motion, a Court must look to Rule 4, which governs the content, issuance, and service of a summons." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010).  In addition, in considering a Rule 12(b)(5) motion to dismiss for insufficient service of process, "a court must look to matters outside the complaint, such as the steps taken by the plaintiff to effectuate service, to determine whether it has jurisdiction." *Darowski*, 2016 WL 4179840, at *2.  "[T]he plaintiff bears the burden of establishing that service was sufficient." *Ahluwalia v. St. George's Univ.*, LLC, 63 F. Supp. 3d 251, 260 (E.D.N.Y. 2014) (internal quotation marks omitted).

### B.  Rule 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), I must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  I must accept as true all of the complaint's factual allegations, *id.*, and must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).[7]  "[T]he submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (internal quotation marks omitted).  But "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss.  *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).

## III.    DISCUSSION

Grayken moves for dismissal for insufficient services of process under Rule 12(b)(5), while the Servicer Defendants move to dismiss the claims against them for failure to state a claim under Rule 12(b)(6).  As explained below, I grant these motions and dismiss Plaintiff's claims against Lone Star and U.S. Bancorp *sua sponte* for failure to perfect service.

### A.  <u>Insufficient Service of Process</u>

---

[7] As noted above, I may also "take judicial notice of public records such as pleadings, orders, judgments, and other documents from prior litigation, including state court cases."  *Musciotto*, 2019 WL 5086691, at *2 (internal quotation marks omitted).

Plaintiff contends that Grayken resides in both "Pryford, England, and Boston, Massachusetts," ECF No. 67 at 4, and that Defendant was served at his residences in each of these locations—specifically, at "Millenium Tower" in Boston and at "Pyrford Court" in Surrey—by process servers on April 8, 2024. *See generally* ECF No. 37; ECF No. 45; ECF No. 46. Rule 4(e) governs Plaintiff's domestic service of process, while Rule 4(f) governs his purported service in the United Kingdom.

Plaintiff's service at Millenium Tower in Boston does not satisfy Rule 4(e) because he has not shown that Millenium Tower was Grayken's "dwelling or usual place of abode." Fed. R. Civ. P. 4(e)(2)(B). Though Plaintiff's opposition brief quotes an article published in January 2018, which reports that Grayken "paid $35 million for an unfinished penthouse condo at Millennium Tower," the very excerpt included in Plaintiff's brief notes that Grayken "couldn't live there full-time if he wanted to," because he "renounced his US citizenship," and so "can't live in the US for more than four months a year." ECF No. 103 at 2 (internal quotation marks omitted).[8] Part-time residences may constitute "dwelling[s]" within the meaning of Rule 4(e)(2)(B) if they contain "sufficient indicia of permanence." *Jaffe and Asher v. Van Brunt*, 158 F.R.D. 278, 280 (S.D.N.Y. 1994). But Plaintiff has not set forth any evidence indicating that Grayken still owned the condo at the time of service in April 2024—more than six years after

---

[8] In any event, I may not consider this article, as it is not judicially noticeable and constitutes hearsay.

this article was published—or that he spent any amount of time there.  He has thus failed to meet his burden of proving that service was proper under Rule 4(e).

Plaintiff's service at Pyrford Court likewise fails to satisfy Rule 4(f).  Rule 4(f) sets forth "three possible ways to effect service abroad," including "compliance with the Hague Convention."  *Icon DE Holdings LLC v. Eastside Distributors*, No. 14 CIV. 2832 PAE, 2015 WL 4557278, at *2 (S.D.N.Y. July 28, 2015).  The United Kingdom is a signatory to Article 10(b) of the Hague Convention, which permits "service of judicial documents directly through…competent persons of the State of destination," including process servers.  20 U.S.T. 361, 363, T.I.A.S. No. 6638; *see In re Aramid Ent. Fund Ltd*., 664 B.R. 9, 43-44 (Bankr. S.D.N.Y. 2024).  It is not clear, however, that service on a defendant's *agent* is permissible under the Hague Convention—or under the law of the United Kingdom.  *See Kelly v. Vesnaver*, No. 16CV883DRHSIL, 2017 WL 2389506, at *7 (E.D.N.Y. Apr. 11, 2017), *report and recommendation adopted*, No. 16-CV-883 (DRH)(SIL), 2017 WL 2389602 (E.D.N.Y. June 1, 2017).

Even if it was, Plaintiff has not established that Petko had actual or apparent authority to accept these documents on Grayken's behalf.  Though Plaintiff's proof of service indicates that the process server asked Petko "if he was authorized to accept [legal] documents on behalf of Mr. Grayken," it does not indicate whether or how Petko replied to that question.  ECF No. 46 at 1-2.  And apparent authority generally only exists where the *principal* induced the third party to believe that another individual was authorized to act on his behalf.  *See Authority*, BLACK'S LAW

13

DICTIONARY (12th ed. 2024) ("[A]pparent authority[:]…Authority that a third party reasonably believes an agent has, based on the third party's dealings with the principal, even though the principal did not confer or intend to confer the authority.").  Plaintiff has not alleged that *Grayken* did anything that led him or the process server to believe that Petko was authorized to accept service on his behalf.  Plaintiff has thus failed to establish that he complied with Rule 4(f).[9]  His claims against Grayken are dismissed without prejudice for insufficient service of process.  *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action *without prejudice* against that defendant….").

**B.  Failure to State a Claim**

As noted already, Plaintiff's claims are not numbered or clearly delineated, which makes it difficult to discern which claims, exactly, he brings and against which Defendants each is raised.  ECF No. 33-1 at 2.  In his prayer for relief, however, he identifies the following claims: (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (2) fraud, (3) breach of the covenant of good faith and fair dealing, (4) tortious interference with contract, (5) violations of the Real Estate Settlement Procedures Act ("RESPA"), and (6) negligent

---

[9] That Grayken eventually received actual notice of this lawsuit and appeared in the case does not cure Plaintiff's failure to comply with Rule 4.  *See William Gottlieb Mgt. Co, LLC v. Carlin*, No. 20-CV-08907 (PAC), 2022 WL 17822578, at *3 (S.D.N.Y. Dec. 20, 2022).

infliction of emotional distress.  *See* ECF No. 67 at 65.[10]  He seeks "the fair value of the home,

$241,300, multiplied-by-three under RICO provisions; damages in an amount the Court sees fit

to compensate the foreclosure Defendants for the negligent infliction of emotional distress and

tortious interference with contract[;] and an injunction preventing the [Defendants]…from

seeking to evict the Defendants, or from otherwise interfering with the foreclosure Defendants'

quiet enjoyment of their home."  *Id.*

### 1.    The *Rooker-Feldman* Doctrine[11]

The Servicer Defendants each move to dismiss this case under the *Rooker-Feldman*

doctrine, which "bars federal district courts from hearing cases that in effect are appeals from

state court judgments." *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021).  For the

reasons set forth before, I conclude that *Rooker-Feldman* is not a bar to jurisdiction in this case.

The Supreme Court has emphasized that this doctrine occupies a "narrow ground": it "is

confined to…cases brought by state-court losers complaining of injuries caused by state-court

---

[10] Plaintiff also repeatedly suggests that Defendants engaged in mail and wire fraud, *see e.g.* ECF No. 167 at 33, but states that he will "leave it up to this Court as to the culpable parties—the lawyers or their clients," *id.* at 65.  Any claim for mail or wire fraud fails "because there is no private right of action under the mail and wire fraud statutes."  *In re Integrated Res., Inc. Real Est. Ltd. Partnerships Sec. Litig.*, 851 F. Supp. 556, 567 (S.D.N.Y. 1994).

[11] Though Defendants raised this issue in their motion to dismiss for failure to state a claim, "[t]he *Rooker-Feldman* doctrine 'concerns a district court's subject-matter jurisdiction.'"  *Chmura v. Norton, Hammersley, Lopez & Skokos Inverso PA*, No. 3:17-CV-2164 (MPS), 2018 WL 2138631, at *2 (D. Conn. May 9, 2018) (quoting *Lance v. Coffman*, 549 U.S. 437, 439 n.* (2007)).  Courts generally must "pass on…jurisdictional issues before considering whether a claim was stated by the complaint."  *Bella v. Bureaus Inv. Grp. Portfolio No. 15 LLC*, 2019 WL 2295840, at *1 (E.D.N.Y. May 30, 2019).  I thus begin by addressing Defendants' arguments regarding *Rooker-Feldman.*

judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005). It "does not deprive a district court of subject-matter jurisdiction 'simply because a party attempts to litigate in federal court a matter previously litigated in state court.'" *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 86 (2d Cir. 2005) (quoting *Exxon Mobil Corp.*, 544 U.S. at 293).

The Second Circuit has "articulated four requirements that must be met for *Rooker-Feldman* to apply: (1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced." *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021) (internal quotations marks and alterations omitted). "Although all four requirements must be met in order for *Rooker-Feldman* to act as a jurisdictional bar[,] the second requirement—that the plaintiff complains of an injury caused by a state-court judgment—is the core requirement from which the other *Rooker-Feldman* requirements derive." *Id.* at 101-102 (internal quotation marks and alterations omitted). As I will explain below, this second prong is where Defendants' arguments fall short.

"In analyzing the second and third prongs—otherwise known as the 'substantive' elements of the test—the Second Circuit has identified several…jurisprudential principles to aid a court's analysis." *Homeowners Fin. Co. v. Lamont*, No. 3:20-CV-01282 (JCH), 2021 WL

4263376, at *5 (D. Conn. Sept. 20, 2021) (internal quotation marks and alterations omitted). "First, it has held that *Rooker-Feldman* squarely forecloses claims that address an injury caused by the state court judgment and require the district court to review that judgment." *Id*. (internal quotation marks and alterations omitted). "Further, the Second Circuit has been careful to adhere to *Exxon*'s reminder that *Rooker-Feldman* does not necessarily bar a federal plaintiff from presenting some *independent* claim, even if such claim denies a legal conclusion that a state court has reached in a case to which he was a party." *Id*. (internal quotation marks and alterations omitted). In other words, an alleged injury that was "merely ratified" by a state-court judgment does not trigger *Rooker-Feldman*. *Dorce*, 2 F.4th at 104 (internal quotation marks omitted).

For example, in *Sung Cho v. City of New York*, the Second Circuit held that *Rooker-Feldman* did not apply because the state court judgment had ratified, but not caused, the plaintiffs' alleged injuries. 910 F.3d 639, 641 (2d Cir. 2018). The plaintiffs in that case were subject to eviction under New York City's Nuisance Abatement Law, and had agreed to settle the eviction proceedings, rather than litigate the nuisance charges. *Id.* "[A]fter the plaintiffs signed their settlement agreements, each of the agreements was 'so-ordered' by justices of the Bronx and New York County Supreme Courts, and the nuisance actions were dismissed." *Id.* at 643. Plaintiffs later brought a federal lawsuit alleging that the eviction proceedings had been used to coerce them into waiving their constitutional rights and that the settlement agreements thus violated the Fourteenth Amendment. *Id.* The Second Circuit noted that Plaintiffs' claims

17

were "about the [settlement] agreements themselves and the conduct that led to them—not the judgments so-ordered by the state court." *Id.* at 646. The Plaintiffs did "not argue that the state courts committed any error," nor were they attempting to remedy "an injury that flow[ed] from [the] state-court judgment." *Id.* at 647, 649. Rather, they were "attempting to remedy an alleged injury caused when, prior to any judicial action, they were coerced to settle." *Id.* at 649.

In *Dorce*, the Second Circuit concluded that *Rooker-Feldman* barred one of the plaintiffs' five claims. 2 F.4th at 101. The City of New York had initiated foreclosure proceedings and transferred ownership of the plaintiffs' properties under the City's Third Party Transfer ("TPT") program. *Id.* at 87, 90-92. The plaintiffs subsequently filed a federal lawsuit, in which they raised two takings claims, an equal protection claim, and two due process claims. *Id.* at 105-07. The Second Circuit found that the takings claim alleging that "Plaintiffs' properties were transferred in violation of the administrative regulations governing the TPT Program" was barred by *Rooker-Feldman* "because the injury Plaintiffs complain[ed] of [wa]s the loss of their property, which was caused by the state court judgments that divested them of that property." *Id.* at 94, 105. "By effecting the divestiture of Plaintiffs' interest in their property, the state court judgments thus directly inflicted the injury complained of." *Id*. at 105. "That satisfies the third *Rooker-Feldman* requirement, because in order to prevail, Plaintiffs would need to persuade the district court that the state court had erred." *Id*.

But *Rooker-Feldman* did not apply to the plaintiffs' "second takings claim—that their property was taken for a public purpose without just compensation—…[because t]hat injury was

18

caused not by the judgment of forfeiture, but by the City's actions following upon the forfeiture." *Id.* at 105. *Rooker-Feldman* likewise did not bar the plaintiffs' claim that the City "disproportionately target[ed] properties in communities of color for foreclosure,…because it is the City that decides which properties to target for inclusion in the TPT Program, prior to any state court proceeding." *Id.* at 106. Nor did it bar plaintiffs' due process claims "based on lack of notice of the in rem foreclosure proceeding." *Id*. The Second Circuit explained that, although resolution of these claims "would require the district court to, in some sense, review the state court judgment, because that judgment concluded that notice *was* provided…this is not the sort of review *Rooker-Feldman* forbids." *Id.* at 106. The doctrine "prohibits lower federal courts only from taking appeals from state courts," but "does not prevent them, as part of adjudicating an independent claim, from denying a legal conclusion that a state court has reached." *Id.* at 106-07 (internal quotation marks and citations omitted).

This court applied these principles in *Homeowners Finance Company,* 2021 WL 4263376, at *4. Similar to *Dorce*, that case arose from "the tax sale of real property on which [the plaintiffs] held a mortgage." *Id.* at *1. The plaintiffs filed a federal lawsuit, in which they asked the court to "adjudicate the legal effect of the state court judgment." *Id.* at *8 (internal quotation marks omitted). The court found that *Rooker-Feldman* applied to all of the plaintiffs' claims. Though some were "styled as arising from the sale of the property itself, rather than the state-court judgment upholding the sale," the court explained that plaintiffs "d[id] not complain of any injuries beyond the sale of its property and the state-court judgment upholding the sale"—

19

like the racial discrimination alleged in *Dorce*—"nor d[id they] allege any misconduct by [the defendant] in procuring the state court judgment." *Id*. at *8-9.

In this case, conversely, Plaintiff's claims are all based on alleged misconduct by the defendants in obtaining the foreclosure judgment. For example, with respect to his RICO claim, Plaintiff alleges that Defendants are part of an "enterprise whereby Lone Star…engag[es] servicers to foreclose using Plaintiffs without standing as Trustees for sham Trusts," including the LSF9 Trust in this case, and that the state court judgment would not have been entered "[b]ut for" this misconduct. ECF No. 67 at 41, 43. Plaintiff's claims against the Servicer Defendants for fraud, breach of the covenant of good faith and fair dealing, violations of RESPA, negligent infliction of emotional distress, and tortious interference with contract are similarly based on their alleged misconduct before or during the state court proceedings. *Id.* at 45 (alleging that the mortgage assignments in July 2016, October 2021, and January 2022 "constitute financial institution fraud because the Court and the Defendants in the original foreclosure action relied on the validity of the assignments"); *id.* at 46 (alleging that Rushmore breached the covenant of good faith and fair dealing "when it refused to acknowledge Defendant O'Brien as a legitimate successor-in-interest to the subject property," and that "all three servicers breached the covenant of good faith and fair dealing by failing to evaluate the foreclosure Defendant's loss mitigation application"); *id.* at 48 (alleging that Rushmore misrepresented the availability of a loan modification to Plaintiff); *id.* at 48, 54 (alleging that Rushmore, Fay Servicing, and Caliber violated RESPA by treating Plaintiff and his foreclosure co-defendants "as strangers to the

mortgage," and failing to timely review his "complete loss mitigation application"); *id.* at 62 (alleging that the Servicer Defendants' misconduct caused Plaintiff and his other foreclosure co-defendants "emotional distress because their home could be stolen away by legal sleight-of-hand"); *id.* at 63-64 ("By adding new terms through the securitization of the mortgage, Defendant Long Star Funds tortiously interfered with the mortgage contract the late Caroline O'Brien executed with Fleet Bank which later merged with Bank of America."). These are independent claims that arise out of Defendants' pre-judgment conduct—not the foreclosure judgment itself. Connecticut state courts may have made findings that are contrary to Plaintiff's allegations, and the complaint at times suggests that the state court erred. *See, e.g.*, ECF No. 67 at 29 ("Based on the apparent misreading of Judge Moore's order, an Order of Ejectment issued…."). But Plaintiffs' claims are not based on these alleged errors, and I could rule for Plaintiff without making such a finding. *Rooker-Feldman* thus does not bar me from adjudicating Plaintiff's claims.

### 2.    Res Judicata

Caliber and Fay Servicing further argue that the claims against them are barred by the doctrine of *res judicata*, or claim preclusion.[12] I agree. Notwithstanding Defendants' alleged

---

[12] "Although res judicata is an affirmative defense under Rule 8(c), the defense may be upheld on a 12(b)(6) motion to dismiss when all relevant facts are pled or shown by records of which the court may take notice"—as they are in this case. *Cirigliano v. Vill. of Afton, N.Y.*, No. 3:09-CV-00298 LEK, 2012 WL 2752867, at *7 n.10 (N.D.N.Y. July 9, 2012).

fraud, Plaintiff had an opportunity to raise and press his legal claims regarding the mortgage foreclosure during his proceedings in state court—and did in fact do so on several occasions.  As discussed below, this is what matters for the purposes of this legal defense.

Under the doctrine of *res judicata*, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).  "In considering the preclusive effect of a state court judgment on a subsequent federal action[,] a court consults the preclusion laws of the state in which the judgment was issued."  *Homeowners Finance Co.*, 2021 WL 4263376, at *10 (internal quotation marks and alterations omitted).

Caliber and Fay Servicing must satisfy four elements to sustain their *res judicata* defense under Connecticut law: "(1) the judgment must have been rendered on the merits by a court of competent jurisdiction; (2) the parties to the prior and subsequent actions must be the same or in privity; (3) there must have been an adequate opportunity to litigate the matter fully; and (4) the same underlying claim must be at issue."  *Giolametti v. Michael Horton Associates, Inc.*, 332 Conn. 67, 75 (2019) (internal quotation marks omitted).  Connecticut has adopted a "transactional test" for determining whether the fourth element is satisfied, under which courts must "inquire whether the prior and present actions stem from the same transaction."  *Weiss v. Weiss*, 297 Conn. 446, 461 (2010).  *Res judicata* thus bars legal claims "based on the same transaction that 'were, or *could have been*, raised in the prior action.'"  *Homeowners Finance*

*Co.*, 2021 WL 4263376, at *10 (quoting *Soules v. Connecticut, Dep't of Emergency Serv. and Pub. Prot.*, 882 F.3d 52, 55 (2d Cir. 2018)) (emphasis added).

Here, Plaintiff appears to concede that the foreclosure action was adjudicated on the merits. *See* ECF No. 67 at 19, 29 (noting that there was a trial, that the case then "worked its way through the Connecticut Appellate and Supreme Courts, and later to the United States Supreme Court," and that "an Order of Ejectment" was later issued and appealed); *see also* ECF No. 91 at 13 (contending that Plaintiff did not have a full and fair opportunity to litigate his claims in state court but not addressing the other three *res judicata* factors). State court filings likewise indicate that the Connecticut Superior Court entered judgment on the merits. *See, e.g.*, ECF No. 74-10 at 9 (indicating that an "Order Re: Proposed Ejectment" was entered on February 9, 2024). Though an appeal of that order was pending when these motions were filed, "[i]n Connecticut, the judgment of a trial court is final, despite a pending appeal, when the issue is the applicability of the rules of *res judicata*." *Martin v. Town of Westport*, 558 F. Supp. 2d 228, 237 (D. Conn. 2008) (internal quotation marks and alterations omitted). Plaintiff likewise does not dispute that both he and U.S. Bank were parties to the state court action and that, as servicers for U.S. Bank, Caliber and Fay Servicing are "in privity" with a party to the prior action. *See also Gibson v. Bank of Am., N.A.*, No. 16-cv-2689, 2017 WL 11685868, at *5 (E.D.N.Y. July 14, 2017) ("District courts generally have found there to be privity between a mortgage servicer and the owner of the mortgage." (internal quotation marks and alterations omitted)). So the first and second elements of *res judicata* are satisfied.

Plaintiff contends, however, that he did not have a "full and fair opportunity to litigate" these issues in the foreclosure action because "there were repeated fraudulent filings—allowed by the Court." ECF No. 91 at 4. But that is irrelevant to whether Plaintiff received an opportunity to raise and press legal claims about the underlying "transaction" or set of facts. And by his own admission, Plaintiff raised at least some of these claims and issues in state court. *See id.* at 4 ("Defendant in filings had pointed-out that the foreclosure Plaintiff…claimed a dead woman had been served a notice; maintained that U.S. Bank with no financial interest in the mortgage was proper Plaintiff, and offered into evidence a fraudulently-notarized lost note Affidavit."). That such allegations "fell on deaf ears" does not mean that *res judicata* does not apply. *Id.* at 4-5; *see Washington v. Blackmore*, 468 F. App'x 86, 87 (2d Cir. 2012) (summary order) ("Washington's argument that res judicata does not apply…because the claim was 'overlooked' by the state courts is without merit, as a claim is barred by res judicata so long as it *could have been* litigated in a prior action."). Nor does the fact that Plaintiff obtained new evidence in support of his claims from the Paatalo Report or other sources. *Powell v. Ocwen Loan Servicing, LLC*, No. 3:18-CV-01879 (JAM), 2019 WL 3412174, at *5 (D. Conn. July 29, 2019), *aff'd*, 840 F. App'x 610 (2d Cir. 2020) ("Connecticut law is clear that *res judicata* does not turn on whether a party happens to have acquired additional evidence or developed new legal theories to support claims that could have been brought in the first instance in the prior action."). Orders and filings from the state court proceedings further indicate that Plaintiff's present claims were in fact litigated in state court—and are based on the same transaction as that action. *See,*

24

*e.g.*, ECF No. 74-16 at 2 (a Connecticut Superior Court order dated June 6, 2022, denying Plaintiff's "motion to open and vacate and to dismiss" because "[t]he assignment provided standing and the movant has exhausted all of his appellate rights as to prior issues"); ECF No. 74-17 at 6-7 (a transcript of proceedings before the Connecticut Superior Court on August 1, 2022, in which the court addressed (1) "new issues as to standing" raised by Plaintiff and (2) allegations that Plaintiff's loan modification request was "not handled properly," thus U.S. Bank "c[a]me[] into th[e] case with unclean hands").  I conclude that all four *res judicata* elements are satisfied with respect to Plaintiff's claims against Caliber and Fay Servicing.

This reasoning applies with equal force to Rushmore: Plaintiff brings the same claims against Rushmore, and, like Caliber and Fay Servicing, Rushmore serviced Plaintiff's mortgage and thus was in privity with U.S. Bank.  *See* ECF No. 67 at 22 ("About three months after servicing was transferred to Fay, it was transferred on 15 June 2021 to Rushmore Loan Management Services, LLC [Rushmore].").  Though Rushmore did not invoke *res judicata* in its motion to dismiss, Plaintiff addressed the issue in his opposition brief, ECF No. 90 at 7, and I can raise *res judicata sua sponte*.  *See Griffin v. Carnes*, 72 F.4th 16, 21 (2d Cir. 2023).  I will thus dismiss all claims against the Servicer Defendants with prejudice under the doctrine of *res judicata*.

**C.  <u>Lone Star and U.S. Bancorp</u>**

Plaintiff failed to timely and properly serve Lone Star and U.S. Bancorp.  Service was due on August 19, 2024—90 days after May 21, 2024, when Plaintiff's second amended

complaint that added these defendants was filed.  *See* ECF No. 67; Fed. R. Civ. P. 4(m).

Plaintiff moved for additional time to perfect service two days later.  ECF No. 98.  I denied this

motion because it was not timely filed and Plaintiff had been warned on several occasions that

untimely motions for extension of time would not be granted.  ECF No. 101.  Plaintiff moved

again for additional time to serve these defendants on December 1, 2024.  ECF No. 108.  He

attributed his prior delays to "spen[ding] most of the summer sick in bed, and los[ing] track of

time," and also moved for leave to amend his complaint.  ECF No. 105.  I denied both of these

motions on December 3, 2024, explaining that "[alt]hough an illness can constitute good cause

for a delay in service, Plaintiff has not provided any details regarding the nature of his illness or

explained why it prevented him from serving these defendants."  ECF No. 109.  Nor had he

"provided a medical letter signed by a licensed physician or explained the more than three-month

gap…between the present motion and his previous motion for extension of time."  *Id.*  As to the

motion for leave to amend, I noted that the Scheduling Order "made clear that any motions to

join additional parties or to amend the pleadings filed after May 7, 2024 must be supported by a

showing of good cause," and that Plaintiff had not made such a showing.  *Id.* (internal quotation

marks omitted).

Though Lone Star and U.S. Bancorp have not moved for dismissal under Rule 12(b)(5), I

can dismiss the claims against them for insufficient service of process *sua sponte* if Plaintiff

receives notice and does not "show[] good cause for the failure."  Fed. R. Civ. P. 4(m).  Here, I

have already warned Plaintiff that failure to timely and properly serve defendants could result in

dismissal of his claims. *See* ECF No. 20 ("If Plaintiff fails to serve Defendant Grayken by April 8, 2024, he shall, by that date, show cause why…the claims against Defendant Grayken should not be dismissed. Failure to show such cause in the event that Defendant Grayken has not been properly served will result in dismissal of the complaint as to Defendant Grayken."). And, as explained already, Plaintiff has not shown good cause for his delays. So I will not afford Plaintiff further notice or permit further delay in entering judgment in this case. Nor will I give Plaintiff further opportunity to serve Lone Star and U.S. Bancorp.[13] This case is thus DISMISSED without prejudice with respect to Lone Star and U.S. Bancorp.

## IV.    CONCLUSION

In sum, Plaintiff's claims against Grayken, Lone Star, and U.S. Bancorp are dismissed without prejudice. His claims against the Servicer Defendants are dismissed with prejudice. The Clerk is instructed to close this case.

IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

_____

[13] I refer to pages 9 through 14 of Caliber's memorandum of law, ECF No. 73, which show this case's lengthy procedural history and Plaintiff's efforts to delay the transfer of title to property required by previous rulings of the state courts. I also note that Plaintiff recently filed in this Court another lawsuit against Lone Star and U.S. Bancorp (as well as two other defendants) arising from the same state court foreclosure proceeding. *See* Dkt. No. 3:25-cv-00458.

Dated: Hartford, Connecticut
      March 31, 2025